Thomas F. Richardson *
Mary Mendel Katz
Emmitte H. Griggs
Jon C. Wolfe
Brown W. Dennis, Jr.
David N. Nelson
John J. Makowski
Norman C. Pearson III
Larry W. Fouché
Frances L. Clay
Jason D. Lewis
J. Travis Hall
Christi Horne James
Joseph D. Stephens
Elizabeth L. Ford

Of Counsel
J. Pope Langstaff

*Admitted in GA & NC
All others admitted in GA

# CHAMBLESS HIGDON RICHARDSON KATZ GRIGGS LLP
## ATTORNEYS AT LAW
www.chrkglaw.com

3920 Arkwright Road • Suite 405 • P.O. Box 18086 • Macon, GA • 31209-8086
Telephone (478) 745-1181 • Facsimile (478) 746-9479

Associated Counsel
Robert B Langstaff, Jr.
Langstaff Law LLC
1916 Dawson Road
Albany, GA  31707

Atlanta Office
Midtown Promenade II
1230 Peachtree St., Suite 1900
Atlanta, GA  30309

Asheville Office
37 Haywood St., Suite 200
Asheville, NC  28801
(828) 398-2993

October 21, 2013

REPLY TO MACON

*Via Federal Express – Tracking Number 7969 5679 0802*

Accommodated Testing
Law School Admission Council
662 Penn Street, Box 8512
Newtown, Pennsylvania 18940-8512

Re: Adelyn M. Bargeron
LSAC Account Number L34002786

Dear Sir or Madame:

Ms. Bargeron has retained this firm to represent her in this matter. This letter is sent in response to your September 9, 2013, letter denying testing modifications for Ms. Bargeron on the LSAT. <u>Please consider this letter as Ms. Bargeron's formal request for reconsideration of LSAC's decision.</u> She is scheduled to take the LSAT on December 7, 2013.

## Factual Background

The specific reasons and grounds for seeking a reversal of LSAC's decision are that the LSAC failed to consider fully and fairly the evidence that Ms. Bargeron submitted and that the LSAC failed to comply with the Americans with Disabilities Act, as amended (ADAAA). In short, LSAC discriminated against Ms. Bargeron by failing to provide reasonable testing modifications that would ensure that the examination tests her ability rather than disability. Please be assured Ms. Bargeron is not seeking an advantage over other test-takers; she is simply asking to be tested on a level playing field with other, non-disabled applicants.

Ms. Bargeron underwent psychological testing three times (1999, 2009, and 2013), and the results have been consistent. In your letter of September 9th denying testing modifications, you cited and relied upon test results from the two-day comprehensive psychological evaluation in August 2013 at the University of Georgia Regents' Center for Learning Disorders. LSAC's characterization and interpretation of the 2013 test results are inaccurate, misplaced, and legally insufficient to withstand scrutiny in light of the ADAAA. Examples include:


EXHIBIT C

Accommodated Testing
Law School Admission Council
October 21, 2013
Page 2

- LSAC cites Ms. Bargeron's performances on *untimed tests* and asserts that they show she does not need additional time on the LSAT.

- LSAC attempts to compare apples with oranges. For example, LSAC cites her performance on the un-accommodated SAT Critical Reading Section to project an expected performance on the LSAT even though the types of reading passages are different and even though one test measures vocabulary and the other measures logical and analytical reasoning processes.

- LSAC misses the point of what the evidence actually demonstrates. For example, you state that although processing speed was noted to be an area of relative weakness, there was not enough evidence to substantiate that Ms. Bargeron experiences functional limitations due to processing speed delays. However, the 2013 evaluation report actually documents that Ms. Bargeron's reading efficiency deficits were due to *executive functioning deficits* rather than to processing speed weaknesses.

These examples are not exhaustive. Enclosed is a letter dated October 8, 2013, from the Regents' Center for Learning Disorders, and we incorporate that letter by reference here. That letter further explains results of the August 2013 testing and specifically responds to your September 9th letter.

Extensive psychological testing and consistent results support test modifications. Ms. Bargeron received accommodations well before entering high school, and they continued through four years of college. In college, she received time and a half during the first semester of the freshman year; in the same semester, it was increased to double time and remained there throughout college. She asked the LSAC to allow time plus half for the multiple choice sections and writing sample sections; to allow additional breaks of five minutes between sections; and to allow a private room for taking the LSAT. Ms. Bargeron's requests are supported by independent psychological testing. They are reasonable. They are neither expensive nor difficult to provide. Such modifications provide access for individuals with disabilities, like Ms. Bargeron, to demonstrate actual knowledge, aptitude and skill on the LSAT rather than to demonstrate the limitations of testing procedures and policies.

## Legal Analysis

Private providers of examinations related to postsecondary education (such as the LSAT/LSAC) are covered by the Americans with Disabilities Act (ADA) and the ADA Amendments Act (ADAAA). They are required to offer such examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 28 C.F.R. 36.309.

For a test-taker with sensory, manual or speech impairments, the test provider must ensure that the examination is selected and administered "so as to best ensure that" the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the [disability].

Accommodated Testing
Law School Admission Council
October 21, 2013
Page 3

- Examinations must be offered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements must be made.
- Required modifications to an examination may include extra time or changes in the manner in which the test is given.
- The test-provider must provide appropriate auxiliary aids and services for test-takers with sensory, manual, or speaking impairments, unless doing so would fundamentally alter the skills or knowledge the examination is intended to test or would result in an undue burden. *Id.*

Therefore, according to the regulations, a test-provider must, once disability is shown, provide the above accommodations.

The term "disability" means, with respect to an individual – " (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C.A. § 12102 (2012). In order to constitute an actual disability under the first prong of the ADA's definition of a disability, an impairment must *substantially limit a major life activity.* The American with Disabilities Act Amendments Act (ADAAA) did not change the definition of a disability, but it did expand the meaning of the phrase "substantially limits." The amendments came into effect on January 1, 2009. Previous to the ADAAA "substantially limit" meant to "significantly restrict." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 197, 122 S. Ct. 681, 691, 151 L. Ed. 2d 615 (2002). However, the ADAAA specifically addressed and eliminated this exacting standard, overturning the line of cases associated with the strict standard. The code now notes that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 42 U.S.C.12102 (4)(A). "Substantially limits" is **not** meant to be a demanding standard. 29 C.F.R. § 1630.2 (J)(3).

Here the LSAC has enacted a standard that is exacting and demanding rather than open to inclusion. The fact that Ms. Bargeron's disability is shown to be limiting on her major life activity of learning and because the request for accommodation is reasonable, there should be no reason to deny her application. Futhermore, to do so would be a violation of the ADAAA.

In a class action lawsuit against the LSAC in California, for failure to reasonably accommodate disabled testtakers, the LSAC noted its accommodations evaluation procedures included, among other things, requirements that testing candidates requesting extra time or other accommodations for a "cognitive or psychological impairment" submit to psychoeducational and neuropsychological testing, and provide a "full diagnostic report" that includes records of the candidates' aptitude and achievement testing. Furthermore, the LSAC requires applicants to disclose in an accommodations request whether or not they took prescribed medications during medical evaluations of their condition, and if not, to explain their failure to do so. *Dep't of Fair Employment & Hous. v. Law Sch. Admission Council, Inc.,* 85 Fed. R. Serv. 3d 655 (N.D. Cal. 2013).

LSAC claims it requires such extensive documentation because it offers "a high-stakes test" and "[i]n order to be fair to all test takers, [it] must ensure that [its] decisions are based on appropriate documentation that supports [an individual's] right to accommodations." *Accommodations Request Packet: Accommodated Testing Frequently Asked Questions*, http://lsac.org/JD/pdfs/FAQ-NON.pdf. Interestingly, this is the same terminology, "high stakes test," mentioned by U.S. Rep. Courtney when he addressed the reason for his and the Education and Labor Committee's support of the ADAAA:

> Unfortunately, the ADA has been misinterpreted by the courts resulting in a narrow view of those eligible to receive certain reasonable accommodations including individuals with learning disabilities. <u>Historically, certain individuals with learning disabilities seeking accommodations in higher education "including high stakes exams"</u> have seen their access to testing accommodations severely undercut by testing companies not willing to consider and support that learning disabilities are neurologically based, lifelong disabilities that may exist in students with high academic achievement because the individual has been able to cope and mitigate the negative impact while simultaneously being substantially limited in one or more major life activities.

154 Cong. Rec. H8286-03, 154 Cong. Rec. H8286-03, 2008 WL 4240260 (emphasis added). Furthermore, in determining an impairment, the fact that there are ameliorating effects cannot be considered. According to 42 U.S.C.A. § 12102 (E)(i):

> The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—
>
>    (I)    medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;
>    (II)   use of assistive technology;
>    (III)  reasonable accommodations or auxiliary aids or services; or
>    (IV)   learned behavioral or adaptive neurological modifications.

Although in the past Ms. Bargeron might have coped or dealt with some tests without accommodation, this does not mean she does not need them. In other words, simply because she managed her own adaptive strategies or received informal or undocumented accommodations that have the effect of lessening the deleterious impacts of her disability in the past does not mean that she should not be afforded the necessary accommodations in the present. Moreover, examining unknown mitigating factors in her past performance says nothing of the fact that she has been found to be disabled by the

UGA's Center for Learning Disorders as well as a licensed psychologist presently, and has a record of such a disability throughout her collegiate career.

We ask the LSAC to reconsider its position with regard to the modifications requested by Ms. Bargeron and that the modifications be allowed. We believe not only that the modifications are permissible under the ADAAA, but that they are *required*. We sincerely hope that litigation can be avoided. However, we are fully prepared to pursue available legal remedies to ensure Ms. Bargeron has an equal opportunity to perform on this most important test.

Sincerely,

Thomas F. Richardson

TFR/ww/43936

Enclosure



# The University of Georgia

*Regents' Center for Learning Disorders*

October 8, 2013

Law School Admission Council (LSAC)
Accommodated Testing
662 Penn Street, Box 8512
Newtown, PA 18940

Dear Sir or Madam,

This letter is in response to the document sent by the LSAC to a client of ours, Adelyn Bargeron. Ms. Bargeron recently underwent a comprehensive evaluation at our center in order to determine whether sufficient and appropriate evidence existed to support her request for accommodations when taking the Law School Admission Test (LSAT). In a letter dated 9/09/13, the LSAC denied accommodations. Its stated rationale raises several concerns, not only in light of the Americans with Disabilities Act, as amended (ADA, 2008) but also from the perspective of accurate psychometrics. The concerns regarding the latter domain are as follows:

1. Using Ms. Bargeron's un-accommodated performance on the Critical Reading section of the SAT as a proxy for her expected performance on the LSAT is unwarranted. These are vastly different tests: The Critical Reading component of the SAT utilizes not only lengthy passages but also brief passages and "sentence completion" items – which are essentially measures of vocabulary – whereas the LSAT comprises items involving dense, scholarly text and logical and analytical reasoning processes.

2. In the letter, the statement "…there is not enough evidence to substantiate that you experience functional limitations in learning in these areas due to processing speed delays" is confusing, as it is unclear what "*these areas*" are.

3. The evaluation report which accompanied Ms. Bargeron's request specifically documented that her reading efficiency deficits were due to *executive functioning deficits* rather than to processing speed weaknesses. Clear examples include her scores on the IVA CPT (e.g., Sustained Visual and Auditory Attention Quotients [measures of abilities related to sustaining attention with flexibility under high demand conditions when stimuli change]: both = 1st percentile; Full Scale Response Control and Attention Quotients [measures of omission and commission errors as well as variability of mental processing speed]: both = 1st percentile) and the BRIEF-A Working Memory scales (94th – 99th percentiles).

4. In an effort to bolster its argument for denying accommodations, the LSAC letter of 9/09/13 cites the Woodcock-Johnson III Tests of Achievement (WJ III ACH) Broad Reading Skills Cluster score (62nd percentile). The intent is obviously to show that, because of such a score, there is no evidence supporting Ms. Bargeron's request for the accommodation of additional time. However, the purported logic is fallacious and misleading of what her testing proves, as this Cluster score comprises several *untimed* reading subtests (including the Passage Comprehension subtest). It is

331 Milledge Hall • Hooper Street • Athens, Georgia 30602-5875
Telephone 706-542-4589 • Fax 706-583-0001
An Equal Opportunity/Affirmative Action Institution

completely inconsistent with the ADA as amended to assert that additional time is not warranted because of percentiles derived from *untimed* subtests.

5. Likewise, the references to Ms. Bargeron's scores on the Passage Comprehension subtest of the WJ III ACH and the Gray Silent Reading Tests are equally misplaced. Both of these measures are untimed. Again, this speaks to the very issue of what our evaluation results delineated: under untimed conditions, Ms. Bargeron demonstrates very strong comprehension skills.

6. We included both stand-alone and embedded measures of test-taking effort and symptom validity in our evaluation procedures, a practice our center has made standard on all evaluations for the last several years. Please consider discussions by Boone (2007), Harrison, Green, & Flaro (2012), and Mapou (2009), among others, regarding the increasing evidence supporting the inclusion of such measures. Ms. Bargeron's scores on all effort/symptom validity tests were consistent with good effort and forthright reporting.

7. The insistence on inclusion of the Nelson-Denny Reading Test (NDRT) is capricious at best. There is considerable empirical evidence questioning appropriateness of this test (please consider Coleman et al., 2010; Mapou, 2009; Ready, Chaudhry, Schatz, & Strazzullo, 2013; Webb, 1983), regardless of its purported usefulness as a reading task whose level of difficulty is deemed commensurate with that of the LSAT items. Its norms are not only outdated, they are also based on grade, not age. Moreover, use of the test was ill-advised from the standpoint of best practices in psychological/psychoeducational assessment, as

   a) Ms. Bargeron was not in the normative range for the NDRT since she was no longer in college, and

   b) Insistence on providing "first year college norms" is tantamount to using the test in unintended ways. This practice is universally frowned upon and not supported by available research.

Concerns regarding the LSAC's decision are also relevant in terms of the ADA (2008):

1. According to §36.309 (b) (i), "...the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills..."

   from www.lsac.org/jd/lsat/about-the-lsat:

   "The LSAT is designed to measure skills that are considered essential for success in law school: the reading and comprehension of complex texts with accuracy and insight; the organization and management of information and the ability to draw reasonable inferences from it; the ability to think critically; and the analysis and evaluation of the reasoning and arguments of others."

2. The issue of "speediness" in analytical reasoning and reading comprehension does not seem germane to the LSAT's intended purpose. The tasks that are most relevant to the LSAT, i.e., reasoning and reading comprehension, are the areas of strength for Ms. Bargeron when she is not facing rigid time constraints.

3. According to §36.309 (b) (v), "When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past

modifications, accommodations, or auxiliary aids or services received in similar testing situations..." The LSAC made no mention of the fact that Ms. Bargeron received academic accommodations (including extra time on exams) throughout her undergraduate career, and she provided documentation reflecting such. Moreover, relative to a number of recent publicized cases concerning LSAT accommodations requests, those which Ms. Bargeron is requesting are nothing if not entirely reasonable.

4. The insistence on inclusion of the NDRT (see point 7, above) is not consistent with the average person standard.

We recognize that the goal under the ADA as amended is to allow for measurement of one's abilities in areas – not measurement of one's disabilities.

We respectfully request that you consider the aforementioned facts as further evidence supporting our recommendations on Ms. Bargeron's behalf. We also request that the comprehensive evaluation report which she submitted be revisited, as corroborating evidence was disseminated in that document.

Thank you for your consideration and attention to this matter.

Cordially,

Scott Miller, Ph.D.
Licensed Psychologist, GA # 2330

Patricia A. Foels, Ph.D.
Staff Clinician